## IN THE UNITED STATES DISTRICT
## COURT FOR THE SOUTHERN DISTRICT
## OF ILLINOIS

AMIEL CUETO,                                )

        Applicant,                    )

                          )

v.                                          )   11-cv-693-DRH

                          )

                          )

UNITED STATES OF AMERICA,                   )

        Respondent.                   )

**FILED**

AUG 1 1 2011

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS
EAST ST. LOUIS OFFICE

### APPLICATION FOR WRIT
### OF ERROR CORAM NOBIS
### PURSUANT TO 28 USC 1651.

Comes now your Applicant, Amiel Cueto, pro se, and for this Application, prays that the

U.S. District Court for the Southern District of Illinois, which sentenced Cueto on September 19,

1997, issue its Writ of Error Coram Nobis vacating Cueto's conviction. Cueto has served his

sentence; he is no longer a prisoner, nor is he in custody, nor is he on probation or supervised

release. In this Application, Cueto pleads that he was and is and always has been actually

innocent. In support of his prayer for relief, Cueto raises six separate points of error, any one of

which establishes a defect in his conviction. Each point pleads a claim which could not have

been raised on direct appeal, or on 2255 Motion. There was no procedural default on the points

of error raised herein. The merits of the six claims have never been adjudicated by any court.

Each separate point establishes the type of defect in Cueto's conviction that would justify habeas

corpus relief if Cueto were still a prisoner.

This Application pleads, and Cueto will prove, that as a result of the wrongful conviction,

Cueto suffers from a continuing and lingering legal disability. This disability presents a serious

and present harm.  This disability includes (among other things):  A)  Loss of license to practice law; and/or B) Deprivation of certain First Amendment rights; and/or C)  Loss of Second Amendment rights.  This continuing legal disability is caused directly by the erroneous conviction, and it is more than incidental.

The six points of error which support this Application, are summarized as follows:

1)  An intervening change of law renders not criminal the conduct for which Cueto was convicted. *Arthur Andersen LLP v. United States*, 544 U.S. 696, 125 S. Ct. 2129 (2005) holds that a person who commits lawful conduct cannot be convicted of a crime.  Cueto was convicted of obstruction of justice and conspiracy, even though all his conduct was lawful.  Cueto's jury was instructed that it could find him guilty "whether (Cueto's conduct had been) lawful or unlawful on its face".

2)  An intervening change of law renders not criminal Cueto's having published an editorial in his newspaper, *East Side Review.*  Among the lawful acts for which Cueto was convicted, was that he had "caused to be published" a newspaper "that was known as the East Side Review" to approximately "48,000 households in the metro east St. Louis area."  (See Paragraph 43 of the Indictment, attached hereto and incorporated herein as AX-1.)  The Indictment alleged that this publication was a crime, in that the editorial was alleged to be a "threat" by "intimidation" that Cueto would prosecute a state Liquor Control Agent "if Cueto won the election for State's Attorney". *Virginia v. Black*, 538 U.S. 343, 123 S. Ct. 1536 (2003) holds that the First Amendment protects speech such as Cueto's editorial, especially if the editorial was never communicated to the state Liquor Control Agent.  The Agent referred to in the editorial was not called as a witness at Cueto's trial, and in fact the Agent never saw the editorial that was alleged to be criminal.

2

3)    An intervening change of law renders not criminal the conduct for which Cueto was

sentenced. At Cueto's sentencing, the trial judge told Cueto that he "should be punished"

because he had "abused the First Amendment", and had treated the First Amendment "with

license". For having abused the First Amendment, Cueto was sentenced to 87 months in prison;

fined $80,000.00; and ordered to pay $500/month for each month of imprisonment. *Citizens*

*United v. Federal Election Commission*, 558 U.S. 50, 130 S. Ct. 876 (2010) holds that the

Government cannot punish a speaker for mocking a public official, even if the trial judge finds

such speech to be an "abuse" of "the First Amendment."

4)    Evidence discovered in 2003 after Cueto's direct appeal and 2255 Motion had been

exhausted, established that the Assistant United States Attorney, Miriam Miquelon, who

prosecuted Cueto, forged the Indictment for which Cueto was held to answer. In other words,

the felony charges for which Cueto was convicted were not from a "presentment or indictment of

a Grand Jury", in violation of the Fifth Amendment to the U.S. Constitution.

5)    Evidence discovered in 2004 after Cueto's direct appeal and 2255 Motion had been

exhausted, established that AUSA Miquelon had fraudulently concealed exculpatory evidence –

that being the grand jury testimony of Congressmen Jerry Costello – from Cueto's defense

before trial. The exculpatory evidence was material and would have resulted in Cueto's acquittal

if Ms. Miquelon had not suppressed it.

6)    Evidence discovered in 2000 and 2001, after Cueto's direct appeal and 2255 Motion

had been exhausted, established that AUSA Miquelon had obtained Cueto's conviction through

the knowing use of perjured testimony from a chief Government witness – James Grogan. Cueto

discovered proof of Grogan's perjury in discovery in proceedings before the Illinois Attorney

Registration and Disciplinary Commission. Grogan was an officer employed by the

Administrator of the ARDC. Documents produced by the Administrator in discovery in the case

of *In Re Cueto*, 97-SH-100, proved massive perjury by Grogan at Cueto's criminal trial.

### FACTS RELEVANT TO THIS
### APPLICATION

Amiel Cueto was a lawyer, licensed in Illinois, Missouri, the U.S. Southern District of

Illinois, the U.S. Seventh Circuit Court of Appeals, and the U.S. Supreme Court. In the late

1960's, he was in the U.S. Army Military Police Corps. In the early and mid 1970's, he was a

police officer on the St. Louis Metropolitan Police Department. In the late 1970's and early

1980's, Cueto was first an investigator and later a prosecutor with the St. Clair County (Illinois)

State's Attorney's Office. Throughout the 1980's and into the 1990's, Cueto was the owner of

his own lawfirm. He had an extensive practice in the Illinois state and federal courts with six

lawyers working for him. Cueto did some criminal defense work, some labor law, some

municipal law, and some First Amendment litigation. But most of Cueto's practice was

concentrated in representing plaintiffs in personal injury cases.

Amiel Cueto also owned and operated a newspaper of general circulation called the *East

Side Review*. Cueto was the publisher, editor, and sole editorial writer for the newspaper. Each

edition of the *East Side Review* in 1994 and 1995, was mailed to more than 48,000 households in

St. Clair County, Illinois. Another fact relevant to this case was Cueto's friendship with U.S.

Congressman Jerry F. Costello. Cueto and Costello grew up together in East St. Louis, Illinois.

They went to school together. Each was the best man in the other's wedding. (Costello's in

1968, Cueto's in 1971.) Each was godfather to the other's children. They owned businesses

together. Cueto was the chief officer in Costello's political campaigns for St. Clair County

Board Chairman and for Congress. They vacationed together with their families every year. At

4

Cueto's trial, when he took the stand in his own defense, Cueto testified that he had four

brothers, three by blood, and Jerry Costello was the fourth.

In the 1980's and early 1990's, Cueto employed a lawyer at his firm named Thomas

Daley. Daley was a former St. Clair County judge whose practice was concentrated almost

entirely in criminal defense. One of Daley's clients was a man named Thomas Venezia, who

owned topless nightclubs and a business called B & H Vending. B & H Vending leased pinball

machines, cigarette machines, video game machines, all types of machines, to bars, restaurants,

hotels, hospitals, even the St. Clair Country Club. B & H Vending also leased video poker

machines to numerous taverns and restaurants throughout Southern Illinois. These machines

were and are legal devices. They do not and never did dispense money to players. And in fact,

there were (and still are) many other businesses throughout Southern Illinois which own and

lease video poker machines to taverns and restaurants. But the machines could be used for

gambling.

The Illinois Liquor Control Commission regulates businesses with state-issued liquor

licenses. The Commission employs agents who are not law enforcement officers. The agents

have no power of arrest. Their sole authority relates to enforcement of state liquor control

regulations. They visit liquor-licensees, inspect the premises and the product, and file reports

with the Commission.

In the 1980's and 1990's, the Illinois Liquor Control Agent for St. Clair County was a

person named Bonds Robinson. In February 1992, Bonds Robinson went to one of Venezia's

topless clubs, where Robinson had a conversation with Venezia's son, Milan. Milan told his

father that Robinson wanted a bribe. Thomas Venezia did not respond to Robinson. In April of

1992, Robinson called the St. Clair County Sheriff's Office to the VFW Post in Shiloh, Illinois,

which was leasing video poker machines from B & H Vending.  Robinson told the Sheriff's officer that the machines were being used for gambling, and the Sheriff's officer arrested a VFW employee.

Thomas Venezia told Thomas Daley that Robinson had caused the arrest of the VFW employee because Venezia had not paid Robinson a bribe.  On April 28, 1992, Daley – with Thomas Venezia in Daley's office – called Robinson's superior in the Illinois Liquor Control Commission.  The superior was a person named Eric Wisette, and Daley called Wisette in Chicago at 312-814-2218.  Daley reported to Wisette that Robinson had been soliciting bribes, and Wisette replied to Daley: "That wouldn't surprise me with that guy."  Thereafter, Venezia did not hear from Robinson for three months.

In August 1992, Robinson again began harassing B & H Vending customers.  Robinson also demanded a personal meeting with Venezia.  Venezia met with Robinson on August 17, 1992.  Robinson tape-recorded the meeting at the direction of the FBI.  Of course this was unknown to Venezia or anyone else outside the FBI.  Despite the fact that Cueto was not a party to the conversation, a transcript of the tape was later entered into evidence by the Government at Cueto's trial.  The tape reveals that Robinson asked for money many times throughout the conversation; at one point suggesting that Venezia should pay him $250.00 a week.  Venezia never committed to pay Robinson, but he intimated that he might be susceptible to paying Robinson something; although Venezia never did pay Robinson a penny at any time.

Venezia also made several bizarre statements on the tape.  Venezia threw out Congressman Jerry Costello's name, even though Costello and Venezia had never met, never spoken, and had never laid eyes on each other.  Venezia also bragged to Robinson, but the braggadocio was false.  For example, Venezia made up the flabbergasting lie that he had been

6

meeting with Costello and Cueto.  None of it was true, and none of it was known to Congressman Costello or Amiel Cueto.  But Venezia's boastful mendacity would have disastrous consequences.

Venezia later convinced Daley that Robinson was continuing to harass B & H Vending customers because Venezia had refused to pay Robinson a bribe.  Daley had reported Robinson the previous April 28, 1992, to Robinson's superior Wisette; but now on August 28, 1992, Daley prepared and signed a Petition for Preliminary Injunction against Robinson on Venezia's behalf. The Petition, signed by Daley, was later entered into evidence by the Government at Cueto's trial.  Daley styled the Petition *Venezia v. Robinson*, and filed it in the chancery court in St. Clair County.  On the same day, August 28, 1992, Cueto went to the office of St. Clair County State's Attorney Robert Haida to report Robinson. Haida came up with a plan to sting Robinson.  Haida told Cueto to set the injunction hearing for Tuesday September 1, 1992.  On Friday, August 28, 1992, Haida called Robinson and told Robinson to be in court on September 1st for another matter.  Haida told Cueto that when Robinson arrived at the courthouse on September 1, 1992, that Cueto should serve a subpoena on Robinson to appear in the chancery court on the *Venezia* matter, where Cueto could cross-examine Robinson under oath.

On Tuesday, September 1, 1992, Venezia, Daley, Cueto, and Cueto's investigator – Robert Romanik – went to the St. Clair County courthouse.  Cueto carried out Haida's plan. Cueto was present when Romanik served Robinson with Daley's Petition, and with a subpoena for Robinson to appear in the chancery court.  After Robinson was served, Cueto walked down the hall outside courtoom one.  Cueto saw Robinson run out of the courtroom to the pay phone.

At the hearing in the chancery court, Cueto asked Robinson whom he had called when he'd gone to the pay phone.  Robinson did not answer at first, but then said he'd called the FBI.

This was the first inkling that anyone outside federal law enforcement had that Robinson had become an informer for the FBI. This fact did not make Robinson innocent of having solicited bribes from liquor businesses. In fact at Cueto's trial, Cueto planned to call as defense witnesses numerous victims of Robinson's extortion racket. However when Cueto began his defense he was forced to disclose witness-statements to the prosecution. Cueto had written, pre-trial statements from three of Robinson's victims (although there were dozens of others who had not given recorded statements to Cueto's investigator). Prosecutor Miquelon had the trial judge bar all of Robinson's extortion victims, including the three who had given statements describing how Robinson had extorted them. These three liquor licensees were Donald Dulle, Robert Karras, and Barney Miller. The order barring their testimony is marked as AX-2; it is attached hereto and incorporated by reference.

Haida had watched the September 1, 1992 proceedings when they first started, but then went back to his office. However when the hearing was over, Haida came back up to the fourth floor of the courthouse and told Cueto that Haida had received a telephone call from First Assistant U.S. Attorney (Southern District of Illinois) Cliff Proud. Mr. Proud had confirmed to Haida that Robinson was an FBI informer. Haida also checked with the telephone company to find out whom Robinson had called from the pay phone outside courtroom one. Haida told Cueto that Robinson had called two numbers: 235-0526, and 346-3600. The first apparently was to the Illinois state police. The second was to Cliff Proud.

Congressman Jerry Costello knew none of this. He was not involved directly or indirectly. Costello had never laid eyes on Venezia and had never spoken to him. Neither Costello nor Cueto had any idea Venezia had used their names on the tape at the August 17,

1992 meeting with Robinson.  Cueto would not discover what Venezia said on the tape until late

1995, when Venezia was on trial, charged with gambling and racketeering.

After the September 1, 1992 hearing, Cueto represented Venezia in the civil litigation

that followed.  In May 1994, Cueto filed a Petition for Writ of Certiorari in the U.S. Supreme

Court in *Venezia v. Robinson*.  When Cueto was (purportedly) indicted in July 1996, Count 2

charged Cueto with Obstruction of Justice in violation of 18 USC 1503, for the lawful act of

having filed the Petition for Writ of Certiorari in the civil injunction case, *Venezia v. Robinson*.

This Petition is attached hereto as AX-3.  Curiously, the Petition was filed in May 1994, but it

was alleged to have obstructed a district court proceeding in *Venezia v. Robinson* which did not

exist because it had been dismissed in 1993.  No one in history, before or since, has ever been

charged with a crime for filing a Petition in the U.S. Supreme Court.  At Cueto's trial and over

Cueto's objection, Ms. Miquelon introduced a redacted version of Cueto's Petition for Writ of

Certiorari as the only evidence in support of Count 2.  This redacted Petition is attached hereto

and incorporated by reference as AX-4.

In July 1994, Haida, was called to a meeting with Miriam Miquelon and the FBI.  Haida

took his lawyer with him.  Haida later told Cueto that Miquelon had terrified him, threatened to

indict him, and had made him sign a false affidavit.  Haida would also completely revise his

version of the events of 1992 by the time he became a Government witness against Cueto at

Cueto's trial, which started on April 7, 1997 and continued until June 11, 1997.  Haida would

also revise what occurred during his investigation of Bonds Robinson in 1992, 1993, and 1994.

One of Robinson's extortion victims was Anthony Joynt.  Joynt owned Illinois

Distributing, the wholesale distributor of Anheuser Busch products in Southern Illinois.  Joynt

told Cueto (and others) in 1992 that Robinson had shaken Joynt down for cash and other perks

9

such as World Series tickets.  In 1993, Cueto worked with Haida on the Robinson investigation, and Haida subpoenaed Tony Joynt and his wife Linda to the St. Clair County grand jury.  At Haida's suggestion, Cueto was in the courthouse when Tony and Linda Joynt arrived at the grand jury.  Tony and Linda both took the Fifth Amendment.  Haida told Cueto that Anheuser Busch would revoke Tony's franchise if Tony were to admit that he'd been paying bribes to a liquor control agent.  In January and June 1994, Cueto wrote two letters to Haida in connection with Haida's investigation of Robinson.  These are attached hereto and incorporated by reference as AX-5.  Count 6 of the purported Indictment against Cueto charged Cueto with Obstruction of Justice in violation of 18 USC 1503, for having written the letters to Haida.  Count 6 alleged that Cueto obstructed a federal grand jury which did not exist in January and June 1994, when he wrote the letters.  The grand jury Cueto was alleged to have obstructed in January and June of 1994 was not impaneled until August 1994.

By January 1995, Cueto had decided to run for St. Clair County State's Attorney in the 1996 election.  The reasons for Cueto's decision had to do with the escalating number of street crimes, including armed robberies and murders.  Cueto was writing about all of this in his newspaper *East Side Review.*  Cueto was also writing about Miriam Miquelon.  In January 1995, Cueto published a three-paragraph editorial on page nine of the newspaper.  The editorial is attached hereto as AX-6 and incorporated by reference.  The text of the entire editorial as Cueto wrote it and published it, is as follows:

### LOCAL JUSTICE DEPARTMENT NAZIS
### WHO ALSO MAY BE PROSECUTED BY
### STATE AUTHORITIES

Here in St. Clair County we have a home-grown group of
Justice Department Nazis.  (See "Glossary of Terms" on page 7).

Two of these – Hitler Youth member Miriam Miquelon of the U.S.
Attorney's Office and FBI-Nazi Donald Taylor – threatened
States's Attorney Robert Haida last summer. As *East Side Review*
has extensively reported, Haida had a lead-pipe cinch perjury case
against FBI surrogate, Bonds Robinson, Jr. The two federal Nazis
– Miquelon and Taylor – threatened to frame Haida on a phony
"Obstruction of Justice" charge in order to prevent the indictment
of Robinson. The threat has worked, so far.

But Miquelon and Taylor have violated the criminal laws
(Intimidation: 720 ILCS 12-6, which is a Class 3 Felony) of the
State of Illinois. Just because these two particular Nazis have
Justice Department badges, doesn't make them immune from
prosecution for their state-law crimes.

The state prosecutors in Idaho may have the courage to
prosecute the federal Nazis who murdered Vicki and Sam Weaver.
The citizens of our community will be wondering whether our
local Nazis will be brought to justice as well. Maybe Haida
himself doesn't have the courage to prosecute them, but that
doesn't mean these Nazis will escape prosecution. Haida's soon-
to-be successor is known to dislike Nazis – in fact he doesn't like
them at all. We might be in for an interesting two years. Stay
tuned to *East Side Review* for complete updates on this continuing
story.

When Cueto was (purportedly) indicted in July 1996, Paragraph 43 of the Indictment

charged the following, which referred to the above editorial:

It was further a part of the conspiracy that in January 1995
CUETO caused to be published through the Century Printing
Company, a newspaper tabloid known as the East Side Review
which he then caused to be mailed to approximately 48,000
households in the metro east St. Louis area. CUETO would and
did threaten by intimidation in the East Side Review that he would
prosecute Robinson if CUETO won the election for States
Attorney.

The editorial referred to in Paragraph 43 was alleged to be the criminal act which made

the conspiracy and obstruction of justice charges in the purported Indictment against Cueto. But

Ms. Miquelon did not want the jury at Cueto's trial to see her name in the editorial. And

although the editorial said nothing directly or indirectly about Robinson being prosecuted by

Cueto, Ms. Miquelon wanted the jury to believe that that was what the editorial really said.

When Ms. Miquelon introduced the editorial into evidence at Cueto's trial, she altered it (over

Cueto's objection) to take her name out.  See AX-7 attached hereto and incorporated by

reference.  AX-7 is Government Exhibit 28-2A.  AX-7 is the same as AX-6, except Miquelon's

name is removed.  At Cueto's trial, Miquelon had two Government witnesses – Haida and John

Dorgan – testify that the name in the blank spaces of GX 28-2A was that of Robinson, not

Miquelon.  When Cueto took the stand in his own defense, he was not allowed to tell the jury

that the name in the blank space of the editorial, as Cueto had written and published it, was that

of Ms. Miquelon.

The editorial was also argued by Miquelon at Cueto's trial to be the criminal act which

made the "corrupt motive" by Cueto.  Cueto could not have been convicted of conspiracy or

obstruction of justice without the "corrupt motive" proved by the editorial, because Cueto's jury

was instructed [see *U.S. v. Cueto*, 151 F. 3d 620, 630-631 (7th Cir. 1998)]:

> Corruptly means to act with the purpose of obstructing justice.
> The United States is not required to prove that the defendant's only
> or even main purpose was to obstruct the due administration of
> justice.  The government only has to establish that the defendant
> should have reasonably seen that the natural and probable
> consequences of his acts was (sic) the obstruction of justice.  Intent
> may be inferred from all of the surrounding facts and
> circumstances.  *Any act*, by any party, *whether lawful* or unlawful
> on its face, may violate Section 1503, *if performed with a corrupt
> motive*.  (Italics added.)

Cueto was the first person in American history to be convicted of a crime even though all

his acts were lawful.  Later, in the Enron collapse in Texas, the accounting firm Arthur

Andersen, LLP would be convicted of Obstruction of Justice under 18 USC 1512(b).  This

statute was nearly identical to 18 USC 1503, the statute Cueto was convicted of violating.

Andersen's conviction also turned on the meaning of the word "corruptly", just as Cueto's had; but the jury instruction in the *Andersen* case was not as defective as the instruction in Cueto's case. The U.S. Supreme Court had declined to review Cueto's appeal; but the Court granted Andersen's Petition for Writ of Certiorari. In a unanimous decision in May 2005, the last opinion of Chief Justice Rehnquist, the Court reversed Andersen's conviction. *Andersen* overrules *U.S. v. Cueto*, 151 F. 3d 620 (7th Cir. 1998), and is an intervening change of law which requires that Cueto's conviction be vacated. In the Enron scandal, the financial collapse had catastrophic economic consequences for the whole country. In the *Cueto* case, the criminal act was a three-paragraph editorial in the *East Side Review.*

Count 7 in the purported Indictment against Cueto alleged that Cueto obstructed justice in the *U.S. v. B&H Vending* case, "by preparing and filing and causing to be prepared and filed false pleadings and court papers in the federal district court." But Cueto never signed or filed any pleadings or court papers in the *U.S. v. B&H Vending* case. There was no evidence that Cueto had signed or filed anything in the *U.S. v. B&H Vending* case. The "pleadings and court papers" referred to in Count 7 never existed. During an *in camera* conference at Cueto's trial, Ms. Miquelon claimed (falsely) that Cueto had prepared a request by a person named Richard Bechtoldt related to Bechtoldt's representation by lawyer William Stiehl, Jr. Although Miquelon admitted that Cueto had never signed or filed this paper. Miquelon never introduced this so-called court paper at Cueto's trial; for that matter, she never even identified it for the record. In any event, the filing of this court paper, even if it had existed, would have been a lawful act. Cueto's conviction on Count 7 must be vacated, because – among other reasons – *U.S. v. Andersen* intervenes to render the performance of lawful acts not a crime.

13

Congressman Jerry Costello never had anything to do with any of this, he never had any contact with Venezia, never attended any court proceedings, never was aware of any pleadings or papers, never laid eyes on Bonds Robinson, never had any knowledge of any of Venezia's business (or personal or other) affairs. Tom Venezia committed suicide in July 2005, long after his release from prison. During his entire life, Venezia had never had any contact with Jerry Costello. But the myth that Jerry Costello had some connection with Tom Venezia, would lead Ms. Miquelon to initiate a multi-year investigation of Costello. When Miquelon finally discovered the truth in April 1996, that there was no connection between Costello and Venezia, that truth did not stop Ms. Miquelon. The charges against Cueto in July 1996, Cueto's trial and conviction and imprisonment, were a part of Ms. Miquelon's pursuit of Congressman Jerry Costello. This pursuit would lead Miquelon to include Costello in the Indictment that she had issued in July 1996, which also charged Cueto. The Indictment was suppressed, and the fact that Costello had been included in the Indictment in July 1996, was fraudulently concealed by Ms. Miquelon. The fact that the Indictment for which Cueto was held to answer had not been from the presentment of a grand jury was not discovered by Cueto until after his release from prison in 2003. Cueto learned that Miquelon had removed Costello's name and had re-written the Indictment herself, so that the document which charged Cueto that was un-sealed on August 9, 1996, was not the indictment of the grand jury.

Ms. Miquelon also believed that in order to get Congressman Costello, she had to coerce Cueto to testify against him. But the intense federal investigation against Cueto from 1992 through 1996, proved that Cueto had never been involved in any gambling, bribery, racketeering, or any criminal conduct whatsoever. That is why the charges against Cueto alleged Obstruction

of Justice by newspaper editorial and by filing a Petition in the U.S. Supreme Court in a civil case on behalf of a client.

The six points of error which explain why Cueto's conviction should be vacated are pleaded more fully below.

### POINTS IN SUPPORT OF WRIT
### OF ERROR CORAM NOBIS

**1)  An intervening change of law renders not criminal the conduct for which Cueto was convicted.  *Arthur Andersen LLP v. United States*, 544 U.S. 696, 125 S. Ct. 2129 (2005) holds that a person who commits lawful conduct cannot be convicted of a crime.  Cueto was convicted of obstruction of justice and conspiracy, even though all his conduct was lawful. Cueto's jury was instructed that it could find him guilty "whether (Cueto's conduct had been) lawful or unlawful on its face".**

The jury instruction in Cueto's case is quoted by the Seventh Circuit in *U.S. v. Cueto*, 151 F.3d 620, 630-31 (1998); and that instruction is recited earlier in this pleading at page 12.  18 USC 1503 makes it a crime "corruptly", or by threat, to "influence", "obstruct" or "impede"; or "endeavor" to "influence, obstruct or impede", the "due administration of law".  The instruction which resulted in Cueto's conviction was circular.  If he influenced the due administration of justice by acting "corruptly", he was guilty; and he acted "corruptly" if he acted to obstruct justice.  *Andersen v. U.S.*, 544 U.S. 696, 125 S. Ct. 2129 (2005) intervenes to overrule the circular instruction approved in *U.S. v. Cueto*, 151 F. 3d at 630-31.  But the main focus of this analysis is directed to the last sentence of the *Cueto* instruction:  "*Any act*, by any party, *whether lawful* or unlawful on its face, may violate Section 1503, *if performed with a corrupt motive*." (Italics added.)  Since the jury was told that Cueto could be convicted whether his conduct was lawful or not, it must be conclusively presumed as a matter of Constitutional law that all of

Cueto's conduct was lawful.  See the *Stromberg* test:  *Stromberg v. California*, 283 U.S. 359, 51

St. Ct. 532 (1931).  See also, *Street v. New York*, 384 U.S. 576, 89 St. Ct. 1354 (1969).  But we

have a more recent opinion from the Supreme Court than the 1931 *Stromberg* test; and that

opinion operates to overrule *U.S. v. Cueto*, 151 F. 3d 620 (7th Cir. 1998), and to require that

Cueto's conviction be vacated.  That recent opinion of course is *Andersen v. U.S.*, 544 U.S. 696,

125 S. Ct. 2129 (2005).

As noted earlier, Arthur Andersen LLP was a partnership convicted of violating 18 USC

1512(b).  When Andersen's conviction was affirmed by the Court of Appeals in 2004, the Fifth

Circuit wrote an opinion almost identical to the Seventh Circuit's opinion in *U.S. v. Cueto*.  The

Fifth Circuit delivered its decision in *U.S. v. Andersen LLP*, 374 F. 3d 281 (2004).  At page 296,

the Fifth Circuit held:

> Congress intended that section 1512(b) have the same scope as
> former section 1503.  Since section 1503 proscribed conduct
> undertaken "with an improper purpose", section 1512(b) should
> also do so...Andersen, moreover gives no explanation why
> "improper purpose" *should require unlawful conduct*.  (Italics
> added.)

Chief Justice Rehnquist, writing for a unanimous Court, had a different view.  In

reversing Andersen's conviction[1], Chief Justice Rehnquist wrote (125 S. Ct. at 2136):

> The outer limits of this element (that is, the level of culpability
> required to impose criminal liability) need not be explored here
> because the jury instructions at issue simply failed to convey the
> requisite consciousness of wrongdoing.  Indeed it is striking how
> little culpability the instructions required.  For example, the jury
> was told that "even if petitioner honestly and sincerely believed
> that its conduct was lawful, you may find petitioner guilty".  The
> instruction also diluted the meaning of "corruptly" so that it

---

[1] How often does it happen that a criminal conviction from a federal trial court is affirmed by a U.S. Court of
Appeals, only to be *unanimously* reversed by the U.S. Supreme Court?  The only recent case your Applicant can
find is *Andersen v. U.S.*, 544 U.S. 696 (2005).

covered innocent conduct.  (Brackets and citations omitted.)

If Chief Justice Rehnquist thought that the *Andersen* instruction diluted the meaning of "corruptly", imagine what the Court's opinion would be of Cueto's instruction.  In Cueto's case, "corruptly" was equated with "acting with the purpose to obstruct", and acting to obstruct meant performing lawful conduct "corruptly".

Chief Justice Rehnquist and the rest of the unanimous Court were incredulous that the *Andersen* jury was told that "even if (Andersen) honestly and sincerely *believed that its conduct was lawful*, you may find (Andersen) guilty".  (125 S.Ct. at 2136, italics added.)  In Cueto's case, the jury was told it could find him guilty despite the fact that all his conduct was lawful "on its face".  In other words, not only did Cueto honestly believe that all his conduct was lawful, the acts he performed were in fact lawful on their face as a matter of Constitutional Law.  *Andersen v. U.S.*, 544 U.S. 696 (2005), operates as an intervening change of law to require that Cueto's conviction be vacated, and that Cueto be granted a new trial.

The *Andersen v. U.S.* opinion also noted a point of law that is particularly applicable to Cueto's case.  Citing the holding in *McBoyle v. U.S.*, 283 U.S. 25, 27, 51 S.Ct. 340 (1931); *Andersen* held (125 S.Ct. at 2134):

> We have traditionally exercised restraint in assessing the reach of a federal criminal statute, both out of deference to the prerogatives of Congress (citation), and out of concern that "a fair warning should be given to the world in language the common world will understand, of what the law intends to do if a certain line is passed." *McBoyle v. U.S.*

How could a lawyer like Amiel Cueto know that by filing a Petition in the U.S. Supreme Court, he would be crossing "a certain line" into criminality?  Especially given the fact that no one in history had ever been charged with a crime for filing a Petition in the Supreme Court; and given that no one since has ever been charged with a crime for filing such a Petition; and given

17

that the Petition which was filed by Cueto in May 1994, was supposed to have obstructed district court proceedings in *Venezia v. Robinson* which had been dismissed in 1993. How could a newspaper publisher like Cueto know that by publishing an editorial critical of two federal officers, Miquelon and Taylor, he could be convicted of obstruction of justice? How could any person know that by performing lawful acts, he could be subject to an 87-month prison sentence? Never since the Sedition Act was repealed on March 4, 1801, has any newspaper publisher been convicted of a crime for having published an editorial in a newspaper. Before Cueto's conviction, no American citizen had been imprisoned for having performed acts that were lawful on their face. Where was the "fair warning" to Amiel Cueto?

Chief Justice Rehnquist and the unanimous *Andersen* Court also overruled the Seventh Circuit's affirming of Cueto's conviction for having "corruptly impeded" a proceeding; a conviction which resulted from an instruction that defined "corruptly" as acting with the purpose to obstruct. Under the instruction in Cueto's case, "obstruct" was a synonym for "impede". The pattern instruction in Andersen's case had defined "corruptly" as: "knowingly and dishonestly, with a specific intent to obstruct or undermine the integrity of a proceeding". (125 S.Ct. at 2136.) However the Government at Andersen's trial insisted on excluding the word "dishonestly" and adding the term "impede" to the phrase "subvert or undermine". *Ibid.* This made the *Andersen* instruction strikingly similar to the *Cueto* instruction. To Chief Justice Rehnquist and the other eight Justices of the Court, the instruction in Andersen's case was fatally defective. Their reasoning shows why the instruction in Cueto's case is also fatally defective: "No longer was any type of dishonesty necessary for a finding of guilt, and it was enough for (Andersen) to have simply impeded the Government". (125 S.Ct. at 2136, brackets and internal quotation marks omitted.) This sentence could have been written to explain why *Andersen v.*

18

*U.S.* overrules *U.S. v. Cueto*. Cueto was also convicted simply because he may have impeded the Government. If Cueto can show a lingering legal disability resulting from his conviction – and he will do so in this Application – then *Andersen v. U.S.* operates to require the issuance of this Court's Writ of Error Coram Nobis.

The law of *Andersen v. U.S.* has direct application to the issue at bar in another respect. Chief Justice Rehnquist pointed out (125 S.Ct. at 2136) that a jury may convict an accused for obstruction of justice only when it finds that the accused had acted "knowingly and dishonestly, with specific intent to subvert or undermine the integrity of a proceeding". In Cueto's case, the jury was told that it could convict Cueto without proof of specific intent. In fact the *Cueto* jury was told that it could convict Cueto if the Government met a standard which is akin to that of negligence in tort:

> The United States is not required to prove that the defendant's only or even main purpose was to obstruct the due administration of justice. The government *only has to establish* that the defendant *should have reasonably seen* that the natural and *probable* consequences of his acts was (sic) the obstruction of justice. Intent may be inferred from all the surrounding facts and circumstances. *Any act…whether lawful…*may violate Section 1503. (Italics added.)

Instead of proof of specific intent to obstruct, the Government "only" had to establish that Cueto "should have reasonably seen" that his *lawful acts* constituted the crime of obstruction of justice. The jury was allowed to infer an intent that was not specific. Not only was Cueto convicted and imprisoned without proof of specific intent to obstruct, the instruction reduced the Government's burden of proof to that which was "probable", as opposed to proof beyond a reasonable doubt. *Andersen v. U.S.*, does not allow conviction without specific intent. Chief Justice Rehnquist wrote that jury instructions must do "limiting work" to prevent conviction for

19

"innocent conduct" (125 S.Ct. at 2136); and certainly the Government's burden of proof has to be higher than that which is "probable".

Irrespective of the other defects in his conviction, Cueto should be granted a new trial on the ground that the jury was allowed to find him guilty for having performed acts which were not criminal. Cueto's conduct was innocent as a matter of Constitutional law. *Andersen v. U.S.* is an intervening change of law which requires that Cueto's conviction be vacated.

**2) An intervening change of law renders not criminal Cueto's having published an editorial in his newspaper, *East Side Review*. Among the lawful acts for which Cueto was convicted, was that he had "caused to be published" a newspaper "that was known as the East Side Review" to approximately "48,000 households in the metro east St. Louis area." (See Paragraph 43 of the Indictment, attached hereto and incorporated herein as AX-1.) The Indictment alleged that this publication was a crime, in that the editorial was alleged to be a "threat" by "intimidation" that Cueto would prosecute a state Liquor Control Agent "if Cueto won the election for State's Attorney". *Virginia v. Black*, 538 U.S. 343, 123 S. Ct. 1536 (2003) holds that the First Amendment protects speech such as Cueto's editorial, especially if the editorial was never communicated to the alleged victim. The Agent referred to in the editorial, Bonds Robinson, was not called as a witness at Cueto's trial, and in fact the Agent never saw the editorial that was alleged to be criminal.**

Paragraph 43 of the Indictment is another first in American history. This charge alleged that Cueto "would and did threaten by intimidation" that Cueto would prosecute Bonds Robinson, "if Cueto won the election for State's Attorney". The first point that must be made is that the alleged "threat" was in the subjunctive mood: Cueto "would prosecute Robinson", but

only "if Cueto won the election". The second point that must be made is the fact that Robinson should have been prosecuted by someone. But leave these points aside. Consider the question of what Paragraph 43 accused Cueto of having done. Also consider that the trial judge read the Indictment to the jury at least twice; once during the reading of the jury instructions. The Paragraph begins, "It was further a part of the conspiracy". The Paragraph goes on to allege that Cueto published the East Side Review to 48,000 households, and that Cueto "would and did threaten by intimidation in the East Side Review that he would prosecute Robinson". Section 1503 makes it a crime to obstruct a pending judicial proceeding, "by threats, or by any threatening letter or communication". So the jury was allowed to find Cueto guilty of obstruction of justice for publishing the editorial as a threatening communication. Also, the evidence of the East Side Review editorial was the proof of "corrupt motive" that converted Cueto's lawful acts into obstruction of justice. But the jury in Cueto's case received no instruction on the definition of "threat" or "intimidation", and both the district court and the Seventh Circuit rejected Cueto's First Amendment argument.

However long after Cueto's direct appeal and 2255 Motion were exhausted, the Supreme Court decided *Virginia v. Black*, 538 U.S. 343, 123 S.Ct. 1536 (2003). *Black* held that the First Amendment protects speech such as Cueto's editorial. The alleged "threat" by "intimidation" was never communicated to the alleged victim. *Black* intervenes to change the law of what constitutes a criminal "threat" by "intimidation"; see 123 S.Ct. at 1548:

> Intimidation in the constitutionally proscribable sense of the word is a type of true threat, where a speaker directs a threat to a person or group of persons with the intent of placing the victim in fear of bodily harm or death.

In the case at bar, the editorial that was alleged to be the threatening communication was never sent to, or read by, Bonds Robinson. And of course Bonds Robinson was never placed in fear of bodily harm or death. Certainly there was no evidence that Robinson had seen the editorial. The Government refused to call Robinson as a witness at Cueto's trial, and had Judge Limbaugh bar Cueto from calling him. *Virginia v. Black* holds that a communication like Cueto's editorial is protected by the First Amendment; and once the editorial qualifies for First Amendment protection, it cannot be admitted into evidence against the accused. See *Dawson v. Delaware*, 503 U.S. 159. 112 S.Ct. 1093 (1992). And of course if *Virginia v. Black* cloaks the editorial under the protection of the First Amendment, then Cueto's having published the editorial in the East Side Review cannot be a crime. See *Texas v. Johnson*, 491 U.S. 397, 109 S.Ct. 2533 (1989).

There is also the fact that the trial court allowed Ms. Miquelon to materially alter the editorial that was alleged to be the threat. See AX-6, the editorial as it appeared in the East Side Review; and compare it to AX-7, which was Government Exhibit 28-2A, the exhibit that Ms. Miquelon was allowed to admit into evidence to the jury as Cueto's editorial. Ms. Miquelon then was allowed to introduce evidence through two Government witnesses – Dorgan and Haida – that the name in the blank spaces of GX 28-2A, was Bonds Robinson, not Miriam Miquelon. (See AX-8, attached hereto and incorporated by reference. AX-8 is several pages from the Trial Transcript of the testimony of Haida and Dorgan.) Reading AX-6, the editorial as Cueto wrote it and published it, there is no question about the fact that Cueto never stated or implied that he would prosecute Robinson for anything. There is also no doubt that the testimony of Dorgan and Haida was false, and that GX 28-2A was a material alteration from the original. *Virginia v. Black* intervenes to void Cueto's conviction, on the ground that the First Amendment protected

Cueto's right to have published the editorial.

The jury in Cueto's case was defrauded by the altered version of Cueto's editorial, and by the false testimony of Haida and Dorgan. The Seventh Circuit was also defrauded by the same false evidence, see *U.S. v. Cueto*, 151 F. 3d at 628:

> Cueto also began to publish a newspaper, the *East Side Review*, and authored an article in which he indicated that in the next election he intended to run for St. Clair County State's Attorney, and in the event he was elected, he would prosecute Robinson.

Irrespective of the other errors shown in this Application, Cueto's conviction should be vacated based on the intervening change of law of *Virginia v. Black*. This Court should issue its Writ of Coram Nobis, vacate Cueto's conviction, and grant him a new trial.

**3)   An intervening change of law renders not criminal the conduct for which Cueto was sentenced.   At Cueto's sentencing, the trial judge told Cueto that he "should be punished" because he had "abused the First Amendment", and had treated the First Amendment "with license".   For having abused the First Amendment, Cueto was sentenced to 87 months in prison; fined $80,000.00; and ordered to pay $500/month for each month of imprisonment. *Citizens United v. Federal Election Commission*, 558 U.S. 50, 130 S. Ct. 876 (2010) holds that the Government cannot punish a speaker for mocking a public official, even if the trial judge finds such speech to be an "abuse" of "the First Amendment."**

Amiel Cueto went to trial charged with seven counts. The jury acquitted Cueto of three, but found him guilty of four, which were:

Count 1, Conspiracy to Defraud the United States, in violation of 18 USC 371. This alleged conspiracy did not involve any pecuniary or property loss. Cueto is unsure as to what the

object of this alleged conspiracy to defraud was supposed to be.  Ms. Miquelon occasionally spoke of a conspiracy to defraud the U.S. out of honest journalism.  Sometimes, she referred to a conspiracy to obstruct justice.

Count 2, Obstruction of Justice in violation of 18 USC 1503.  This charge was that Cueto wrote and filed a Petition for Writ of Certiorari in the U.S. Supreme Court on May 31, 1994. Cueto's Petition was 22 pages (see AX-3); however the redacted version the jury saw, Government Exhibit 85-12, was a few lines.  (See AX-4).  The judicial proceeding allegedly obstructed by Cueto's Petition was the proceeding in the U.S. District Court on *Venezia v. Robinson*.  But the district court proceedings had been dismissed in 1993.

Count 6, Obstruction of Justice in violation of 18 USC 1503.  This charge was that Cueto wrote two letters to Robert Haida related to Haida's investigation of Bonds Robinson.  One letter was written in January 1994, the other was written in June 1994.  See AX-5.  These letters were alleged to have obstructed a federal grand jury that did not exist until August 1994.

Count 7, Obstruction of Justice in violation of 18 USC 1503.  This charge was that Cueto prepared and filed in the U.S. District Court in *U.S. v. B & H Vending*, certain unidentified pleadings and court papers.  But there was no evidence that such pleadings and court papers existed.  None were ever introduced into evidence.

However, when Cueto was sentenced, the trial judge (the Honorable Stephen Limbaugh), made clear that the crux of the real charge against Cueto, was his having published the *East Side Review*.  Attached hereto and incorporated by reference is AX-9, which is page 65 of the Sentencing Transcript from September 19, 1997.  Judge Limbaugh called Cueto and his lawyer to the podium in front of the bench, and explained Cueto's crime and the reasons for the sentence, as follows:

THE COURT:  All right.
Mr. Cueto, if you and counsel will come forward please.
I really feel that one of the jewels of our system is the First
Amendment.
And the First Amendment gives all of us unprecedented
rights that other people in the world do not have.
It does not authorize license.  And in my judgment, Mr.
Cueto, you have abused the First Amendment, you have treated it
with license, and you have abused the judicial system.
And for that you should be punished.

For having abused the First Amendment and having treated it with license, Cueto, who

had never in his life before the case at bar, been charged with a crime or an ethical violation, was

sentenced to 87 months in prison (which included imprisonment in Level 5, maximum security

U.S. penitentiaries), an $80,000 fine, and $500/month for each month of incarceration.

The Seventh Circuit echoed Judge Limbaugh with this comment on Cueto's newspaper

publication at footnote 7, 151 F.3d at 628:

> In the *East Side Reivew*, Cueto also authored and published
> various articles in which he complained of prosecutorial
> misconduct in association with the racketeering case and attacked
> the integrity and reputations of various Assistant United States
> Attorneys involved in the indictment and prosecution of the
> racketeering case.

Cueto is unsure as to which articles the Seventh Circuit was referring.  All editions of the

*East Side Review* were made part of the trial and appellate record (over Cueto's objection).  But

only a redacted version of Cueto's editorial, Government Exhibit 28-2A, was introduced into

evidence before the jury.  The Seventh Circuit, in affirming Cueto's conviction and sentence,

commented that Cueto had "complained about prosecutorial misconduct", and had "attacked the

integrity and reputations of various Assistant United States Attorneys".  The Court of Appeals

comments imply that the Seventh Circuit was affirming Judge Limbaugh's rationale for

25

punishing Cueto:  that being that Cueto had "abused the First Amendment", and had "treated it with license".

However now we have *Citizens United v. Federal Election Commission*, 558 U.S. 50, 130 S. Ct. 876 (2010).  The majority opinion is a 53-page dissertation on why our Constitution recognizes no such principle as a criminal "abuse of the First Amendment." *Citizens United* is an intervening change of law which overrules Cueto's conviction and sentence.

In *Citizens United*, a not-for-profit corporation published a documentary attacking the integrity and reputation of Senator Hillary R. Clinton.  Because the corporation faced civil and criminal penalties under the Bipartisan Campaign Reform Act (BCRA), Citizens United sued the Federal Election Commission.  The Act banned publication of the documentary within 30 days before an election, among other things.  The Court found the criminal penalties in the Act unconstitutional as a violation of the First Amendment; and in an opinion that could have been written to vacate Cueto's conviction, held the following:

> Courts, too, are bound by the First Amendment...First Amendment standards, however, must give the benefit of any doubt to protecting rather than stifling speech.  (130 S.Ct. at 891, internal quotation marks omitted.)

> Speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people...The right of citizens to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it.  The First Amendment has the fullest and most urgent application to speech uttered during a campaign for political office.  (130 S.Ct. at 898, internal quotation marks omitted.)

> For these reasons, political speech must prevail against laws that would suppress it, whether by design or inadvertence.  (130 S.Ct. at 898.)

> Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or

> viewpoints…Speech restrictions based on the identity of the
> speaker are all too often simply a means to control content.  (130
> S.Ct. at 898-99.)

Cueto had the absolute, First Amendment right to publish the editorial (GX 28-2A),

mocking public officials Miquelon and Taylor; just as Citizens United had the right to publish

the documentary mocking Senator Clinton.  This is especially true, given Cueto's announcement

contemporaneous with the publication of the editorial that he planned to run for States Attorney.

Judge Limbaugh and the panel on the Court of Appeals may have disfavored the content of

Cueto's speech.  They may have judged the speech as an "abuse" of the First Amendment.  But

*Citizens United* is an intervening change of law that operates to require this Court's Writ of Error

Coram Nobis, vacating Cueto's conviction and sentence.


**4)   Evidence discovered in 2003 after Cueto's direct appeal and 2255 Motion had**

**been exhausted, established that the Assistant United States Attorney, Miriam Miquelon,**

**who prosecuted Cueto, forged the Indictment for which Cueto was held to answer.  In**

**other words, the felony charges for which Cueto was convicted were not from a**

**"presentment or indictment of a Grand Jury", in violation of the Fifth Amendment to the**

**U.S. Constitution.**

The first three points are intervening changes of law, based on Supreme Court cases

which were decided after Cueto's direct appeal and 2255 Motion were exhausted.  This Point 4 is

based on Cueto's discovery in 2003, that prosecutor Miriam Miquelon had re-written the

Indictment against Cueto.  At Ms. Miquelon's insistence, the grand jury named Congressman

Jerry Costello in the Indictment handed up on July 18, 1996 in case number 96-30070.  However

Miriam Miquelon had not received Justice Department permission to indict the Congressman,

27

and the 1995-1 grand jury's term expired on July 31, 1996. A new grand jury was sworn in on or about August 1, 1996. The grand jury's Indictment of July 18, 1996 was suppressed on Miriam Miquelon's motion. When Ms. Miquelon had the Indictment unsealed on August 9, 1996, Costello's name had been removed. The document unsealed on August 9, 1996, was not the Indictment that had been presented by the grand jury. The purported indictment on which Cueto was held to answer, was never returned or presented by a grand jury, in violation of the Fifth Amendment to the U.S. Constitution.

This may be another first in American history. It is certainly a structural error that can never be harmless. See *Sullivan v. Louisiana*, 508 U.S. 275, 281, 113 S.Ct. 2078, 2082-83 (1993):

> Another mode of analysis leads to the same conclusion that harmless-error analysis does not apply. In *Fulminante* we distinguished between, on the one hand, structural defects in the constitution of the trial mechanism, which defy analysis by harmless error standards, and, on the other hand, trial errors which occur during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented. (Internal quotation marks and citations omitted.)

*Sullivan* concluded that the deprivation of such a "right, with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as 'structural error'". 508 U.S. at 281-82, 113 S.Ct. at 2083.

Violation of the Fifth Amendment right which protects an accused against being held to answer for an infamous crime, unless on a presentment or indictment of a grand jury, can only be a structural error. As one might imagine, there are few cases which construe the Fifth Amendment right to be held to answer for a federal felony, only by presentment or indictment of a grand jury. There were two holdings in *Ex parte Bain*, 121 U.S. 1, 7 S. Ct. 781 (1887). The

first holding was that a material change to an indictment deprived the court of jurisdiction. This jurisdiction holding was overruled by *U.S. v. Cotton*, 535 U.S. 625, 122 S.Ct. 1781, 1785 (2002). However the second holding of *Bain* is still good law, and was in fact expressly re-affirmed in *Cotton*, 122 S.Ct. at 1785. See *Bain*, 7 S.Ct. at 781:

> When the indictment is filed with the court, no change can be made in the body of the instrument by order of the court or by the prosecuting attorney, without resubmission of the case to the grand jury.

Cueto had filed a habeas corpus claim in July of 2002, when he was still a prisoner. Cueto was granted a limited evidentiary hearing on April 30, 2004, at which hearing the following facts were revealed for the first time. These facts and the inferences from the facts have never been disputed.

A) The tape recording of the hearing before the magistrate on July 18, 1996 on the *Cueto* Indictment, was found to be erased. At the hearing on April 30, 2004, the Court allowed only court personnel to testify. Nevertheless, the witnesses proved that the only record of what occurred at the hearing on the *Cueto* Indictment, had disappeared. After an indictment is returned by a grand jury in the U.S. Southern District of Illinois, the prosecutor reports to the magistrate in open court, indentifying who was indicted on what charges, and having bail set, among other things. There is no court reporter present in the courtroom; the only record is a tape recording of the proceedings. This is what occurred on July 18, 1996, when Ms. Miquelon appeared before the magistrate at the hearing in the East St. Louis Courthouse to report the *Cueto* Indictment. In the East St. Louis Courthouse, there are hundreds, maybe thousands of tapes of these hearings. At the place where the record of the proceeding reporting the Indictment against Cueto is supposed to be, the tape has been erased. The tape of the hearing which took place immediately before the *Cueto* Indictment hearing was found to be intact, and the tape of the

29

hearing which took place immediately after the *Cueto* Indictment hearing was also intact.   This erasure of the tape had to be intentional, and it had to be done by someone in authority.   The inescapable inference is that Ms. Miquelon erased the tape to cover up the fact that Congressman Costello had been named in the Indictment returned by the grand jury on July 18, 1996.   Which is proof that the document unsealed on August 9, 1996 was not the Indictment of the grand jury. The instrument which charged Cueto was the presentment of Miriam Miquelon, not a grand jury.

      B)  The grand jury "ballot" from Cueto's Indictment disappeared from the locked, secure storage vault where grand jury records are kept.   These grand jury ballots are sacred instruments which are maintained under a strict protocol, with limited access only by authorized personnel.   In December 2003, the Court sought to retrieve the grand jury ballot on the *Cueto* Indictment.   But the ballot was missing.   Later, a document which was purported to be the missing grand jury ballot, was found in a drawer in a non-secure room in the Clerk's office.   But no one could explain how that could have happened.   It had never happened before, and no one could establish a chain of custody for the alleged ballot.

      C)  The transcript of Ms. Miquelon's presentation to the grand jury on July 18, 1996 on Cueto's case, also disappeared.   In December 2003, the U.S. Attorney's Office had a purported copy re-printed.   But there was no foundation for the authenticity of the copy.

      D)  The signature on the Indictment unsealed on August 9, 1996, purported to be that of the U.S. Attorney W. Chuck Grace.   However, Mr. Grace could not have signed Cueto's Indictment, because Mr. Grace was in Benton, Illinois, working at the federal courthouse there, during the entire week of July 15 through July 19, 1996.   Benton is 80 miles from the East St. Louis Courthouse.   Cueto could find no record of W. Chuck Grace having signed any Indictment, ever.   The practice was always that the Indictment was signed by the Assistant U.S.

Attorney handling the case.  Mr. Grace later told the press that if his signature had been stamped

on the Indictment, it was authorized.  But there was no explanation as to why Miriam Miquelon

would not have signed the *Cueto* Indictment, or as to why she would have stamped W. Chuck

Grace's signature on the Indictment.

        E)  The file-stamp on the Indictment that was unsealed on August 9, 1996, has

been altered.  The original file-stamp was not dated July 18, 1996.  If one looks at the first page

of AX-1, one sees that the "8" in the file-stamp was handwritten.  There is a reasonable inference

that Ms. Miquelon did not file-stamp the original Indictment, because she knew that she might

have to alter it by removing Costello's name.

    All of these facts, among others, were revealed at the April 30, 2004 hearing.  However

the Court never reached the merits of Cueto's habeas claims under 28 USC 2241.  The Court

dismissed Cueto's habeas case on the ground that the Court lacked subject matter jurisdiction.

See AX-10, attached hereto and incorporated by reference.  Cueto's 2241 claim was construed to

be a second 2255 Motion, requiring the permission of the Court of Appeals.

    Also introduced during the habeas proceedings was an Affidavit signed and sworn to by

attorney John O'Gara on January 27, 1997.  In the Affidavit, lawyer O'Gara swore that he had

seen the Indictment naming Jerry F. Costello along with Amiel Cueto.  Mr. O'Gara saw the

Indictment in the Courtroom of the Honorable Paul Riley, Judge of the U.S. Southern District of

Illinois.  See AX-11, Mr. O'Gara's Affidavit, attached hereto and incorporated by reference.

    Cueto had first introduced the O'Gara Affidavit in pre-trial proceedings in 1997.

However Judge Limbaugh held a secret hearing on January 29, 1997.  No members of the press

or the public were allowed to attend the secret hearing.  See AX-12, same being a newspaper

article dated January 30, 1997, entitled: "Cueto hearing is kept secret", attached hereto and

incorporated by reference. Also, Judge Limbaugh held a double-secret hearing during the secret hearing which only Ms. Miquelon was allowed to attend. Cueto was not allowed to call O'Gara or any other witnesses at the secret hearing, nor was he allowed to testify himself. Judge Limbaugh ordered Cueto never to divulge O'Gara's Affidavit, or what had occurred at the secret hearing.

At the April 30, 2004 hearing, the Court told Cueto that he should arrange to have a forensic examination of the tape which had been erased. Cueto contacted a forensic tape examiner named James A. Griffin. Mr. Griffin thought he might be able to recover all or part of that which had been erased from the tape. See AX-13, attached hereto and incorporated by reference, same being a letter dated May 10, 2004 from Cueto the Court, with a copy of Mr. Griffin's resume'. The Court kept Cueto's case under advisement until December of 2005. Apparently, the Court changed its mind about allowing the forensic examination. The Court dismissed Cueto's habeas claim on grounds of lack or jurisdiction on December 15, 2005.

Finally on this point, News-Democrat reporter George Pawlaczyk interviewed Arlene Agne in December 2003. Ms. Agne had been the Grand Jury Foreperson in the East St. Louis federal courthouse in July 1996. Ms. Agne told Pawlaczyk that the grand jury had indicted Congressman Costello in the same case as the *Cueto* Indictment. However by December 2003, Miriam Miquelon had resigned. Pawlaczyk did not print the story, and Cueto has been unable to get Pawlaczyk's deposition. However at an evidentiary hearing, both Mr. Pawlaczyk and Ms. Agne can be called to testify under oath.

On grounds of the structural error raised in this Point 4, this Court should issue its Writ of Error Coram Nobis, granting Cueto a new trial. In the alternative, the Court should grant an

32

evidentiary hearing to allow Cueto to conduct discovery and adduce evidence relevant to this Point 4.


**5)   Evidence discovered in 2004 after Cueto's direct appeal and 2255 Motion had been exhausted, established that AUSA Miquelon had fraudulently concealed exculpatory evidence – that being the grand jury testimony of Congressmen Jerry Costello – from Cueto's defense before trial.  The exculpatory evidence was material and would have resulted in Cueto's acquittal if Ms. Miquelon had not suppressed it.**

During the habeas proceedings in 2003, Cueto discovered proof, for the first time, that Ms. Miquelon had lied to the Court to fraudulently conceal from Cueto's defense in 1996 and 1997 (before Cueto's trial), that Jerry Costello's grand jury testimony was exculpatory and material.  When Cueto was arraigned on August 14, 1996, Ms. Miquelon had the magistrate impose unprecedented bail conditions on Cueto[2].  Cueto was not allowed to have any communication with any potential government witness, including but not limited to any persons who had been called to the grand jury in 1996.  Jerry Costello was included on the list.  Cueto immediately requested the Court to relax the bail conditions so that Cueto could talk to Costello, citing their long friendship.  Ms. Miquelon responded on September 3, 1996, with a pleading filed under seal, styled: "Government's Response to Defendant Amiel Cueto's Motion to Modify Pretrial Release Conditions".  See AX-14, attached hereto and incorporated by reference, in which (on page 6, footnote 2), Ms. Miquelon pleaded the following:

> Parenthetically, Cueto uses his long time friendship with
> Congressman Costello as an example where the release conditions
> are unfairly restrictive, claiming that Costello's grand jury

---

[2] Initially, Cueto agreed to some of the conditions because otherwise, Ms. Miquelon stated she would call witnesses to show that Costello was a co-conspirator.  But after Cueto agreed to the conditions, Ms. Miquelon leaked that allegation to the press anyway.

testimony will only be helpful to his defense. The government is prepared to make an in camera submission of 3500 material to the Court to demonstrate that just the opposite is true.

Cueto had no communication with Congressman Costello between August 14, 1996, the day he was arraigned, and sometime after September 19, 1997, the day he was sentenced. And although Ms. Miquelon told the Court and jury during voir dire that the Government would call Costello as a witness, that never happened. It turned out that Ms. Miquelon did everything she could, including lying to the Court and to Cueto's defense counsel, to bar Cueto from subpoenaing Costello to testify at trial. Ms. Miquelon knew that Costello's testimony would have resulted in Cueto's acquittal.

Before trial, Cueto knew that Costello had testified before the grand jury on April 15, 1996. Cueto thought Costello's testimony would be exculpatory, but Cueto's counsel, Ron Jenkins, insisted that the defense had to take the Government at its word. Jenkins told Cueto that the Government would be committing reversible error under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963), if Costello's testimony turned out to be exculpatory. That would mean that Ms. Miquelon's pleading to the Court (AX-14) had been an outright lie. Mr. Jenkins (wrongly) believed that Ms. Miquelon would not risk reversible error.

In his 2255 Motion, Cueto did allege that Miquelon had fraudulently concealed Costello's testimony. However at that time, Cueto still could not prove that Miquelon had been lying, nor could Cueto prove what Costello's grand jury testimony had been. Judge Limbaugh denied the 2255 Motion. When Cueto filed his 2241 habeas application in July 2002, Miriam Miquelon was the U.S. Attorney for the Southern District of Illinois. But in July 2003, Ms. Miquelon left the Justice Department. Newspaper reports stated she was fired or had been

34

ordered to resign[3]. So Cueto's 2241 case was assigned to an AUSA from Chicago named Gillum Ferguson.

Mr. Ferguson examined Costello's grand jury testimony after the April 2004 hearing. Mr. Ferguson realized that the Costello testimony was favorable to Cueto; and he agreed that the evidence was *Brady* material. The trial judge on the 2241 case wrote:

> The United States now concedes that the grand jury testimony of Congressman Costello (was favorable to Cueto). The United States submitted this material with the view that this (grand jury) transcript "should have been disclosed to the defense under the general principles of *Brady v. Maryland*, 373 U.S. 83 (1963)."

The Government admitted that *Brady* applied to Miquelon's fraudulent concealment of the Costello evidence by quoting the *Brady* case.

> (T)he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment irrespective of the good faith or bad faith of the prosecution.

Mr. Ferguson was nothing if not thorough in his investigation. He contacted Ron Jenkins, Cueto's lead defense counsel at trial. Mr. Jenkins responded to Mr. Ferguson with a letter dated September 15, 2004. A copy of that letter is attached hereto and incorporated by reference as AX-15. Your Applicant prays that the Court will read this letter in its entirety, because it recites facts which prove this Point 5. Especially note where Jenkins reports to Mr. Ferguson:

> I contacted Mr. Costello's lawyers (Anton Valukas and Jeffrey Colman). They would not allow me to interview Rep. Costello, in part, because they had been told by Ms. Miquelon that he had committed perjury in his April 1996 grand jury testimony and could be indicted for perjury.

---

[3] AX-16 is a newspaper article dated October 23, 2003, which reported that police found nineteen stolen guns, including two sawed-off shotguns, and also bomb-making materials, in Miquelon's home at 500 Pike Lane in Troy, Illinois.

Also note Paragraph 7 in Mr. Jenkins' letter:

> 7. Ms. Miquelon personally warned me that putting Jerry Costello on the stand would be highly detrimental to my client and that she would move the Court to admonish the witness of his privilege against compulsory self-incrimination before he testified.

Also note Mr. Jenkins statement in Paragraph 9:

> 9. To me this was more than a *Brady* violation. It was a concerted, fraudulent, all out effort to assure Jerry Costello did not testify as a defense witness.
>
> I made the final call (although it was with the agreement of my client). We could not risk putting Mr. Costello on the stand if he, in fact, had given sworn grand jury testimony adverse to Mr. Cueto. In short, I made the mistake of taking Ms. Miquelon at her word.

The trial judge ruled on Cueto's 2241 application on December 15, 2005. The Court did not reach the merits of Ms. Miquelon's fraudulent concealment of the Costello testimony. The Court dismissed the 2241 application for lack of subject matter jurisdiction.

The law on this point is quite clear. *Kyles v. Whitley*, 514 U.S. 419, 433-34, 115 S.Ct. 1555, 1565 (1995) held:

> [R]egardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. Internal quotation marks omitted.

*Kyles* also held (514 U.S. at 434, 115 S.Ct. at 1566): "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal". *Kyles* holds (id) that the standard is:

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A reasonable probability of a different result is accordingly shown when the

36

government's evidentiary suppression undermines confidence in the outcome of the trial. Internal quotation marks omitted.

Ms. Miquelon lied to the trial court before Cueto's trial about Costello's grand jury testimony so that she could falsely convict Cueto, in order to coerce Cueto into "cooperating" with Ms. Miquelon in framing her real target: Congressman Jerry F. Costello. Cueto did not discover proof of Ms. Miquelon's lie until 2004, long after his direct appeal and 2255 Motion were exhausted. Amiel Cueto is entitled to this Court's Writ of Error Coram Nobis, vacating his conviction, and granting him a new trial. In the alternative, Cueto prays for an evidentiary hearing at which he can call witnesses and produce in open Court, once and for all, Jerry Costello's grand jury testimony. The Government has acknowledged that the Costello evidence was *Brady* material, and has implicitly acknowledged that Ms. Miquelon's pleading (AX-14) was a lie. But to this day, Cueto has not seen the Costello transcript.

**6)   Evidence discovered in 2000 and 2001, after Cueto's direct appeal and 2255 Motion had been exhausted, established that AUSA Miquelon had obtained Cueto's conviction through the knowing use of perjured testimony from a chief Government witness – James Grogan.  Cueto discovered evidence of Grogan's perjury during discovery in proceedings before the Illinois Attorney Registration and Disciplinary Commission.  Grogan was an officer employed by the Administrator of the ARDC.  Documents produced by the Administrator in discovery in the case of *In Re Cueto*, 97-SH-100, proved massive perjury by Grogan at Cueto's criminal trial[4].**

---

[4] The perjury Cueto proves up in this pleading is separate and distinct from different perjury which Cueto showed in his 2255 Motion. In the 2255, Cueto had a page and a half (pp. 26-27) showing Grogan had lied about his contact with U.S. Attorney W. Chuck Grace, wherein Grogan had agreed with Grace's request to use ARDC procedures to compel Cueto to be a witness against himself. The 2255 Motion was denied by Judge Limbaugh.

James Grogan was an officer with the Administrator of the Illinois Registration and Disciplinary Commission (hereinafter referred to as the ARDC). The ARDC regulates lawyer discipline in Illinois. The Administrator is the Investigator/Prosecutor of lawyer misconduct. Mr. Grogan was on the Administrator's staff. Before September 19, 1997, the day Cueto was sentenced in the case at bar, Cueto had never been charged with anything in the ARDC. It is true that the Administrator and Mr. Grogan had investigated Cueto many times in the 1980's and 1990's; but these were investigations into political matters, such as political statements Cueto had allegedly made, or political contributions he'd made. Of the thousands of clients who'd hired Amiel Cueto, none had ever complained against him in any forum. And in any event, the Administrator never could find any basis to charge Cueto with an ethical violation, until Cueto was convicted in the case at bar.

Cueto's conviction was based in large part on the expert opinion of Government witness James Grogan. Cueto was disbarred (eventually) solely because of his conviction; and his conviction was procured by the testimony of James Grogan, testifying as an expert for the Government. Mr. Grogan was not a fact witness. He had no personal knowledge of any matter related to Cueto's case. The only (alleged) relevance of his testimony, was his opinion that Cueto had committed the crimes with which he had been charged by Ms. Miquelon. Cueto objected of course, but Ms. Miquelon claimed that Mr. Grogan was a neutral, disinterested expert, and Judge Limbaugh allowed his testimony. Cueto was not allowed to interview Mr. Grogan, before trial, let alone take his deposition. Grogan's testimony was a surprise at the trial, and so cross-examination was difficult. However in disbarment proceedings against Cueto in the ARDC, Cueto was able to discover proof (even though he was locked up in prison), that Grogan's testimony at Cueto's trial had been a tissue of lies and perjury.

38

Attached hereto and incorporated by reference is AX-17, which is an excerpt from Grogan's testimony at Cueto's trial.  In response to a question by Miriam Miquelon, Grogan told the jury that a lawyer was ethically required:

> (T)o check with other people, to check court files, to do whatever is necessary to make certain that that which the lawyer is providing to the court and a judge is, as best as possible, accurate.

That was at Volume 22, page 84, lines 6-10 of the transcript from Cueto's trial.  See AX-17.  The irony is obvious considering the massive perjury Grogan was about to commit in front of Judge Limbaugh and Cueto's jury.  At the very next line on page 84, line 11, Ms. Miquelon asked Grogan:

> Q:  And sir, before testifying here today, what if any documents and other materials have you reviewed in connection with this case?

On line 14 at page 84 (AX-17), Grogan gives this answer under oath: "I had the opportunity to review portions of the transcript of proceedings before the jury."  This answer was an outright perjury, and the proof is in AX-18, a list of some of the documents and other materials Grogan had reviewed prior to his May 20, 1997 testimony at Cueto's trial.  See AX-18, attached hereto incorporated herein by reference.  If Grogan had been truthful in his May 20, 1997 trial testimony, he would have listed the following "documents and other materials (Grogan had) reviewed in connection with this case".

> A)  A fax from Miriam Miquelon to James Grogan consisting of eleven pages, sent on April 7, 1997; and

> B)  A letter from Miriam Miquelon to James Grogan dated January 3, 1997, with the salutation: "Dear Jim"; and

> C)  A pleading for the prosecution, *drafted by Grogan*, entitled: "Government's Request For Court To Take Judicial Notice of Illinois Rules of Professional Conduct"; and

39

D) An ARDC Memorandum – with Grogan's notes – sent by fax from Grogan to Miquelon on May 14, 1997, where Grogan strategizes with Miquelon about how to handle Cueto's cross examination of Grogan at trial; and

E) A copy of 705 ILCS 205/4 from Grogan to Miqeulon, which Grogan wants to discuss as part of the prosecution's trial strategy; and

F) A copy of a text on lawyer discipline, which Grogan wants to discuss with Miquelon as part of a trial strategy. [The text has this ironic passage: "The duty to report (lawyer) misconduct has thus been used to rid the (legal) profession of those (who had) radical political views."]; and

G) A copy of the case *Weber v. Cueto*, 568 N.E.2d 513 (1991). Don Weber was a Republican politician who had (unsuccessfully) sued Cueto for hundreds of millions of dollars; and

H) A fax from Grogan to Miquelon dated April 9, 1997, in which Grogan tells Miquelon, "I did not want to burden you with a telephone call." Grogan tells Miquelon that with respect to "the tasks at hand" (that being the trial against Cueto which had commenced two days earlier), Grogan hopes "all is going well" for Miquelon; and

I) Numerous pages of notes made by or for Grogan; and

J) A Memorandum from Grogan to Miquelon which is tellingly labeled: "WORK PRODUCT"; and

K) A letter from the ARDC to Cueto's trial defense counsel dated April 9, 1997 (a copy of which was sent to Miquelon by Grogan). In this letter, the ARDC refuses to produce copies of the files it has on Cueto. Cueto later learned that Grogan had turned over all these files to Miquelon, and that Grogan had helped Miquelon use these files to frame Cueto; and

L) Another fax from Grogan to Miquelon dated April 3, 1997, where Grogan apologizes for being "so wordy" in strategizing with Miquelon against Cueto; and

M) Numerous pages of notes and instructions from Grogan to Miquelon on how to structure the case against Cueto.

Grogan lied and perjured himself at Cueto's trial, and of course Grogan did so with the willing participation of Miriam Miquelon, because if Grogan had told the truth the jury would have known that Grogan was a de facto prosecutor, who had helped Miriam Miquelon build the frame-up against Amiel Cueto. If Grogan hadn't perjured himself to Cueto's jury, Cueto would have been acquitted.

The lies listed above were not the only Grogan perjury that Cueto discovered in 2001, after his direct appeal and 2255 had been exhausted. In ARDC discovery, Cueto was able to depose Grogan. The deposition proved other massive and shocking perjury by Grogan at Cueto's trial. Grogan lied to the jury that he'd made "no notes" before Cueto's trial, when in fact ARDC discovery revealed reams of notes Grogan sent to Miquelon to help her frame Cueto. Grogan lied to the jury that he'd met with Ms. Miquelon only once in preparation for his testimony at Cueto's trial. This turned out to be one of the more devious Grogan lies. Grogan told the jury that he'd met with Miquelon only once, and that had been "in Fairview Heights". But it turned out that Grogan had met with Miquelon many times in East St. Louis and other places, where he and Miquelon had built the frame against Cueto. There probably has never been a witness in the history of federal (or state) trials in Illinois, whose testimony was more thoroughly steeped in lies, than was Grogan's massive perjury at Cueto's trial.

Without Grogan's perjury, Cueto would have been acquitted. But a showing of probable acquittal is not necessary. All Cueto has to show here is that there is a reasonable likelihood that Grogan's perjury *could have affected* the verdict. Grogan was a chief Government witness. He claimed that he was testifying at Cueto's trial with the sanction of the Illinois Supreme Court, as an expert on lawyer-ethics. His opinion that Cueto had obstructed justice went a long way in helping build the frame-up against Amiel Cueto. Cueto's discovery in 2001 of proof of Grogan's

41

perjury requires that his conviction be vacated. *U.S. v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2393, 2397 (1976), held:

> (A) conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.

Amiel Cueto prays that on the ground of the prosecution's knowing use of Grogan's perjury, this Court will issue its Writ of Error Coram Nobis, vacating Cueto's conviction, and granting him a new trial.

## SUBSTANTIAL AND CONTINUING
## LEGAL DISABILITY TO
## AMIEL CUETO, CAUSED BY
## THE ERRONEOUS CONVICTION.

Cueto has shown six separate points of error, any one of which is a basis to establish a defect in Cueto's conviction. None of the six could have been raised on direct appeal or on a motion for relief under 28 USC 2255. The first three points are intervening changes of law which render Cueto's conviction void, all three decided after Cueto's direct appeal and 2255 Motion had been exhausted. The last three points of error are based on fraudulently concealed facts and evidence, proof of which was not discovered until after the direct appeal and 2255 were denied. However, showing that Cueto's conviction was wrongful is not all that is required to obtain this Court's Writ of Error Coram Nobis. The second part requires the applicant to show a substantial legal disability that causes "serious harm to the petitioner." *Howard v. United States*, 962 F.2d 651 (7th Cir. 1992). Specifically, *Howard*, 962 F.2d at 653-54, holds:

> Thus, the types of disabilities sufficient to justify coram nobis relief can be broken down into three elements. First the disability must be causing a present harm; it is not enough to raise purely

42

> speculative harm or harms that occurred completely in the past.
> Second, the disability must arise out of the erroneous conviction.
> Third, the potential harm to the petitioner must be more than
> incidental.

The Seventh Circuit has held that the loss of a law license is precisely the type of civil

disability that supports issuance of a writ of error coram nobis. *United States v. Craig*, 907 F.2d

653 (7th Cir. 1990). In *Howard*, the petitioner had been a lawyer in Indiana; however Howard's

loss of his law license did not arise from his conviction. Howard had voluntarily surrendered his

license. Also, although Howard had applied for reinstatement in Indiana, there was no evidence

that the Indiana Supreme Court had rendered a decision on his application.

In the case at bar, there is no doubt about the fact that Cueto's conviction was the sole

proximate cause of his involuntary disbarment. Attached hereto and incorporated by reference is

AX-19, a pleading Cueto filed in the Illinois Supreme Court on May 12, 2008, styled: "Petition

To Vacate Order of Disbarment Pursuant To The Fourteenth Amendment To The U.S.

Constitution". This Petition proves that Cueto fought his disbarment fiercely for six years. It

also proves that Cueto was disbarred *only* because of his conviction, no acts of ethical

misconduct were alleged or proved. See e.g. page 8 of AX-19:

> Therein the Administrator admitted that the ARDC was *not* going
> to apply Rule 753. The administrator also admitted at page 5 (in
> the Brief of the Administrator): "An examination of the
> Administrator's complaint shows that it did *not* attempt to allege
> specific acts of misconduct".

So there is no question that in Cueto's case, Cueto's disbarment had nothing to do with

Cueto's underlying conduct, which the ARDC Review Board acknowledged (see AX-19, pages

2-4) had been based entirely on lawful acts. And there is no question that in the case at bar, the

Illinois Supreme Court had denied Cueto's "Petition To Vacate Order Of Disbarment". That

Order is dated June 12, 2008, marked as AX-20, attached hereto and incorporated by reference.

Also, the record shows a substantial present harm in that Cueto had been one of the more successful trial lawyers in the metropolitan St. Louis area. He'd tried dozens of major civil and criminal cases in numerous counties in Southern Illinois and in the U.S. District Court. He'd argued cases in the Illinois Supreme Court, Seventh Circuit Court of Appeals, and in the Illinois Appellate Court (4th and 5th Districts). He'd helped write the briefs and had sat at counsel table in arguments before the U.S. Supreme Court (although the oral argument was conducted by Cueto's co-counsel). Cueto had been a member of the American Board of Trial Advocates, the Association of Trial Lawyers of America, the National Association of Criminal Defense Lawyers, the Illinois Trial Lawyers Association, and numerous national, state and local bar associations. Moreover on the basis of Cueto's conviction alone, he was disbarred in the federal district court, U.S. court of appeals, and U.S. Supreme Court. There is no doubt that the loss of Cueto's law license is causing serious and present harm.

There are other disabilities causing serious and lingering harm to Amiel Cueto. After Cueto was charged with having obstructed justice by "causing to be published" his newspaper, *East Side Review*, Cueto stopped writing and publishing. He has not participated in any publication whatsoever since 1996. Amiel Cueto took great pride and satisfaction publishing his newspaper, but he cannot do so as long as he is subject to imprisonment for the crime of having "abused the First Amendment". This Court should issue its Writ of Coram Nobis to restore to Amiel Cueto the most fundamental of rights guaranteed to all American citizens: The First Amendment right to speak and to write freely, even if that speech offends certain public officials.

Another lingering civil disability causing Cueto serious and present harm, is Cueto's loss of his Second Amendment right to keep and bear arms. The Seventh Circuit has previously held that loss of the right to possess firearms is the type of present disability which confers coram

nobis jurisdiction. See *United States v. Keane*, 852 F.2d 199, 203 (7th Cir. 1988). Recently, the U.S. Supreme Court has held that Second Amendment rights are fundamental, individual rights; that the right to keep and bear arms is entitled to the same protection as the other freedoms guaranteed by the Bill of Rights. See *District of Columbia v. Heller*, 544 U.S. 570, 128 S.Ct. 2783 (2008). The Court also held that the right to bear arms is applicable to the states through the Fourteenth Amendment. *McDonald v. Chicago*, 130 S.Ct. 3020 (2010).

The Second Amendment right is personal to Amiel Cueto. He is a veteran who is the son of a veteran. Cueto's son is a decorated combat veteran of the war in Afghanistan, who as of this writing is still an active duty soldier. See Ax-21, attached hereto and incorporated by reference. Amiel Cueto is a former police officer and prosecutor. He has been around firearms all his adult life, through service in the military and in law enforcement. The right to keep and bear arms to Amiel Cueto is inextricably intertwined with the tradition of military service that has been a part of his family for more than 70 years. Deprivation of that right is a serious and lingering harm that can only be cured by this Court's Writ of Error Coram Nobis.

## CONCLUSION

There are six points of error pleaded in this Application. Any one is grounds to issue the Writ of Error Coram Nobis. None was available when Cueto's direct appeal and 2255 Motion were adjudicated. Cueto's wrongful conviction has caused a serious and present and continuing legal disability in at least three respects, any one of which confers coram nobis jurisdiction. Amiel Cueto prays that this Court will correct a manifest injustice and award its Writ of Error Coram Nobis, vacating his conviction, and awarding him a new trial.

Amiel Cueto, pro se
7110 West Main Street
Belleville, Illinois 62223
(618) 277-1554

## AMIEL CUETO'S APPLICATION FOR WRIT OF
## ERROR CORAM NOBIS
## APPENDIX:  TABLE OF CONTENTS.

AX-1    Indictment:  *U.S. v. Cueto*, file-stamped July 18, 1996.

AX-2    Order by Judge Limbaugh denying defense witnesses
        Dulle, Karras, and Miller.

AX-3    Petition for Writ of Certiorari; filed by Cueto May 31, 1994, in
        *Venezia v. Robinson.*

AX-4    Redacted version of Petition For Writ of Certiorari admitted
        against Cueto as GX 85-12.

AX-5    Cueto's two letters to Haida, dated January and June 1994.

AX-6    East Side Review editorial from January 1995, entitled: " LOCAL
        JUSTICE DEPARTMENT NAZIS WHO ALSO MAY BE
        PROSECUTED BY STATE AUTHORITIES".

AX-7    Redacted version of East Side Review editorial admitted against
        Cueto as GX 28-2A.

AX-8    Trial transcript excepts, Government witnesses Dorgan and Haida.

AX-9    Sentencing Transcript, page 65.

AX-10   Order dated December 15, 2005, dismissing habeas corpus
        application for lack of jurisdiction.

AX-11   Affidavit of John O Gara, dated January 27, 1997.

AX-12   Belleville News Democrat article dated January 30, 1997: "Cueto
        hearing is kept secret".

AX-13   May 10, 2004 letter from Cueto to the Court, with resume' of
        forensic tape examiner.

AX-14   Government Response filed September 3, 1996, in which Ms.
        Miquelon pleaded that Costello's grand jury testimony would be
        adverse to Cueto's defense.

AX-15   Letter from Ron Jenkins to AUSA Ferguson dated September 15,
        2004.

AX-16    News Democrat Article dated October 23, 2003: "Miquelon friend gets 8-year sentence".

AX-17    Excerpt from testimony of James Grogan, May 20, 1997, Trial Transcript Volume 22, page 63 and page 84.

AX-18    Documents Cueto received in discovery in ARDC proceedings in 2001, which proved massive perjury by James Grogan at Cueto's trial.

AX-19    "Petition To Vacate Order of Disbarment Pursuant to the Fourteenth Amendment to the U.S. Constitution," filed by Amiel Cueto on May 12, 2008, in the Illinois Supreme Court, MR 19679.

AX-20    Illinois Supreme Court Order dated June 12, 2008, denying Cueto's "Petition To Vacate Order of Disbarment", MR 19679.

AX-21    Newspaper article re: Gregory Eloy Cueto.